UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                     Case No. 06-CR-79

CULET ATEMKENG,

    Defendant.

### RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

On April 11, 2006, a grand jury sitting in the Eastern District of Wisconsin returned a one count indictment naming Culet Atemkeng ("Atemkeng") as the defendant. Atemkeng is charged with knowingly possessing a counterfeit United States Alien Documentation, Identification, and Telecommunications (ADIT) stamp, knowing that the ADIT stamp had been forged, counterfeited, altered and falsely made, in violation of 18 U.S.C. §§ 1546(a) and 2. On April 14, 2006, Atemkeng was arraigned and entered a plea of not guilty. In accordance with the pretrial motion schedule, on May 5, 2006, Atemkeng filed a motion seeking an order "for disclosure of electronic surveillance information, as well as an order setting a hearing to determine whether any such information tainted the evidence upon which the current charges are based." (Def.'s Mot. at 1.) On May 18, 2006, this court denied the defendant's pretrial motion in part as moot and in part without prejudice.

Thereafter, on June 9, 2006, Atemkeng filed a letter addressed to Judge Clevert, to whom this case is assigned for trial. In this letter, Atemkeng indicated that she intended to "renew the issue of interception and searches of the defendant's mail on the basis of Fourth and Ninth Amendments

constitutional violations." (Def.'s Ltr. at 2.)  Thereafter, on July 21, 2006, the defendant filed a motion to suppress any and all evidence obtained in violation of the defendant's rights pursuant to the Fourth and Ninth Amendments to the United States Constitution, and on July 31, 2006, the government filed its response.  Because the issues raised by the defendant seemed to involve factual disputes, on November 9, 2006, an evidentiary hearing was conducted with respect to the defendant's motion to suppress.  Thereafter, the parties filed briefs in support of their respective positions on the issues raised by the defendant. Consequently, the defendant's motion to suppress is now fully briefed and is ready for resolution.  For the reasons which follow, it will be recommended that the defendant's motion to suppress be denied.

## II. FACTUAL BACKGROUND

One witness testified at the evidentiary hearing: Customs and Border Protection Officer William Koepke.  The following is a brief summary of the testimony offered at the evidentiary hearing conducted on November 9, 2006.

William Koepke ("Koepke") testified that he is an officer with the Customs and Border Protection.  He has been a Customs and Border Protection officer for six years.  The Customs and Border Protection agency examines and searches items entering and exiting the country to determine whether anything illegal is either entering or leaving the country.  Koepke's specific assignment is to inspect outbound packages.  In the course of his duties, Koepke examines packages that are going out of the country and if necessary, he searches the packages.  Koepke performs these duties at the three Fed-Ex facilities in the Milwaukee metropolitan area.  Koepke generally does not inspect packages at each of the three facilities each night.  Rather, Koepke typically visits and inspects packages at two of the three facilities in the Milwaukee metropolitan area each day.

2

When examining packages, Koepke will look at where the package is coming from, where it is going, what the description is, the value of it, and based upon what the package looks and feels like determine whether the package appears to coincide with the description provided. (Tr. at 23.) If Koepke decides not to search the package, the package is given to the international auditor who then determines whether Fed-Ex has enough information to ship the package, pulls the top copy of the airway bill, and then places the package into either a cannister or bag to be loaded onto the truck going to the airport. The packages generally leave the Wauwatosa facility at 8:45 p.m., and the truck which takes the packages to the airport goes directly to the airport, that is, it does not make any stops.

The Fed-Ex airplane generally leaves Milwaukee for Memphis at 9:00 p.m. There is no Customs and Border Protection officer at General Mitchell International airport. There is no officer at the airport because the time frame from when the trucks arrive at the airport and the departure time to Memphis does not allow ample time to review the packages at the airport. Once in Memphis, all of the packages are resorted by destination, that is, all of the packages destined for Cameroon are put together to be shipped to Africa. (Tr. at 28.) While Customs and Border Protection officers work at the Memphis facility, packages are generally not searched at the Memphis facility. (Tr. at 31.) This is because there is not enough manpower at the Memphis facility to review packages there. Memphis is the last stop in the United States before the packages leave the country. (Tr. at 29.) Koepke testified that it is unlikely that an international package leaving one of the three Fed-Ex facilities in the Milwaukee metropolitan area will be searched again prior to crossing the United States border.

On August 29, 2005, Koepke was inspecting outbound packages at the Fed-Ex Watertown Plank Road facility in Wauwatosa, Wisconsin. (Tr. at 9.) Koepke arrived at the facility at

approximately 7:00 p.m. Koepke testified that he examined approximately forty (40) packages that were going out of the country at the Wauwatosa facility that night. Koepke further testified that on that night, and at that facility, he searched approximately one dozen (12) packages that were going out of the country. Koepke testified that he searched the package at issue in this case, that is, Koepke searched the package which bore the airway bill introduced into evidence as Exhibit 1. Koepke testified that he searched the package at issue because the airway bill provided a poor description of documents, it had a higher value than what he typically sees associated with packages containing documents, and the package was going to Cameroon. (Tr. at 13.) Koepke testified that he has seen increased counterfeit merchandise coming from "that area," and there was a possibility that the package contained currency going to Cameroon in exchange for counterfeit merchandise. Koepke also testified that he decided to search the package because the package did not feel like a document package because it was not pliable and bendable. Rather, the package was more rigid, and felt like there was something else in it. (Tr. at 14.)

Koepke opened the package and found two Cameroonean passports. Koepke looked through the passports and saw an I-551 stamp on the passports, which did not appear correct. Koepke has seen I-551 stamps before and the stamps on the quality of the color on the Cameroonean passports did not look correct. (Tr. at 16.) An I-551 stamp is used when an individual is granted permanent legal residency in the United States. In the interim, that is, before an official "green card" is issued to the individual, the Citizenship and Immigration Service will stamp passports with an I-155 stamp which connotes that the passport holder is a legal permanent resident of the United States. (Tr. at 16-17.) The I-551 stamp is, essentially, a "green card." After detaining the package, Koepke returned to his office and ran both of the resident alien file numbers ("A" numbers) located on the

4

I-551 stamps through the system. Koepke testified that the "A" numbers located on the I-551 stamps did not match the individuals on whose passports the numbers were stamped. (Tr. at 17.) Based upon this information, Koepke concluded that the stamps had been altered. Koepke then spoke with Agent Patricolo with the Division of Customs Enforcement, and Koepke turned the documents over to Agent Patricolo so that the documents could be sent to the Forensic Document Lab.

On cross-examination, Koepke testified that passports are sometimes called travel documents. (Tr. at 30.) The term document does not preclude the contents of a package from being travel documents, including a passport. Koepke further testified that the packages are not searched at the Memphis facility because of a lack of manpower and a lack of time. And, the lack of time to review documents in Memphis is a result of the government's concession to Fed-Ex's efforts to get packages delivered within 24 hours. (Tr. at 32.) Koepke also testified that at least one-third of the packages coming out of the Milwaukee metropolitan area are never inspected. (Tr. at 33.) Koepke does not know the actual replacement value of two Cameroonean passports. (Tr. at 38.) And, he testified that he does not follow a list of formal standards when inspecting the outbound packages.

On redirect, Koepke testified that he was trained that he has the authority to examine anything entering or leaving the United States based upon the border search authority. He further testified that when he searched Atemkeng's package, he was not sure whether any evidence of illegal activity would be found inside the package. (Tr. at 51.)

### III. DISCUSSION

The Fourth Amendment requires that searches and seizures be reasonable. Generally, a search is not reasonable unless the government has a warrant supported by probable cause or the search falls within an exception to the warrant requirement. One exception to the warrant

5

requirement is the border search exception. Such being the case, "a border search is constitutional so long as it is reasonable." *United States v. Yang*, 286 F.3d 940, 944 (7th Cir. 2002). And, the U.S. Supreme Court has held that routine searches without a warrant at this country's international borders are reasonable per se. *United States v. Ramsey*, 431 U.S. 606, 616 (1977).

Indeed, the reasonableness of a particular search depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself. *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). And, it is well-established that "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior." *Id.* at 538. "Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant and first-class mail may be opened without a warrant on less than probable cause." *Id.*; *see also Ramsey*, 431 U.S. at 616-17 ("[S]earches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border."). The U.S. Supreme Court has stated that:

> [since] before the adoption of the Fourth Amendment, [border searches] have been considered to be "reasonable" by the single fact that the person or item in question had entered into our country from outside. There has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause. This longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless "reasonable" has a history as old as the Fourth Amendment itself.

*Ramsey*, 431 U.S. at 619. Thus, the border search exception "is a longstanding, historically recognized exception to the Fourth Amendment's general principle that a warrant be obtained." *Id.* at 621.

6

Furthermore, border searches "may in certain circumstances take place not only at the border itself, but at its functional equivalents as well." *Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973). The "functional equivalent" of a border has been defined as the first practical detention point after the border crossing. *See United States v. Carter*, 760 F.2d 1568, 1577 (11th Cir.1985). A three-prong test has been developed to determine whether a search occurs at the functional equivalent of the border. *See United States v. Hill*, 939 F.2d 934, 937 (11th Cir. 1991). Under this test, a basis for a functional equivalent of the border search exists if (1) there is reasonable certainty that the border was crossed; (2) no opportunity for the object of the search to have changed materially since the border crossing; and (3) the search occurred at the earliest practicable point after the border crossing. *Id.*

In *California Bankers Ass'n v. Shultz*, the U.S. Supreme Court indicated that the aforementioned border search exception might also apply to outgoing searches, stating that "those entering and *leaving* the country may be examined as to their belongings and effects, all without violating the Fourth Amendment." 416 U.S. 21, 63 (1974) (emphasis added). And, a number of circuits, that is, the Second, Third, Fourth, Fifth, Sixth, Eighth, and Ninth, have extended the border exception to outgoing searches, and no circuit that has addressed this issue has held otherwise. *United States v. Odutayo*, 406 F.3d 386, 391 (5th Cir. 2005) (collecting cases). Thus, the border search exception to the Fourth Amendment, which is "traditionally applied to searches of incoming cargo and baggage, applies with equal force to outgoing searches." *Id.* at 388.

Turning to the facts of this case, the question before the court is whether the search conducted by Officer Koepke was a routine border search conducted at the functional equivalent of the border. The defendant argues that Officer Koepke's search was a nonroutine search because "he [only]

7

searched the particular packages that peaked his interest or raised his curiosity," and because the search was "non-routine" it must be supported by reasonable suspicion. (Def.'s Br. at 8.); *United States v. Johnson*, 991 F.2d 1287, 1291 (1993) ("When a border search and seizure becomes nonroutine, a customs official needs reasonable suspicion to justify it."). According to the defendant, in order for a search to be considered "routine," the officer must search either every package, or every third package, or randomly search various packages. In short, the officer could not rely upon a subjective suspicion to determine which of the many packages he examines to actually open up and search.

The defendant's argument, however, cannot carry the day. This is because "[a] customs official may search a border entrant's luggage and outer clothing in a reasonable manner based on *subjective suspicion alone*," or even on a random basis, if the search and seizure may be characterized as routine. *United States v. Johnson*, 991 F.2d 1287, 1291 (7th Cir. 1993) (emphasis added) (citing *United States v. Braks*, 842 F.2d 509, 514 (1st Cir.1988)). And, although Officer Koepke's suspicions were subjective, I am persuaded that his search of the package at issue in this case can be characterized as routine. Courts typically "focus on the degree of intrusion into a border entrant's legitimate expectations of privacy," that is, the intrusiveness of the search when determining whether a search is routine or nonroutine.[1] *Johnson*, 991 F.2d at 1291.

> A search at the border of a traveler's luggage and personal effects is routine. The search of a border entrant's suitcase, purse, wallet, and overcoat simply is not

---

[1] Officer Koepke did not testify regarding the terms of the contract with FedEx that Atemkeng accepted by signing the waybill. However, Exhibit One, the waybill signed by Atemkeng, provides that one condition of Atemkeng's contract with FedEx was that her "shipment may, at our option or at the request of government authorities, be opened and inspected by us or such authorities at any time." (Ex. 1 at 2.) At the very least, this shows that Atemkeng did not have a heightened expectation of privacy in the contents of her package.

sufficiently intrusive to be considered nonroutine. By contrast, a body cavity or strip search of the border entrant himself is significantly more intrusive and most certainly is *non* routine.

*Id.* at 1291-92 (citations and footnote omitted) (emphasis in original).

Here, Atemkeng's package was subject to a routine border inspection and not something more intrusive. Officer Koepke examined all of the forty (40) international packages and decided to search (12) packages based on his subjective suspicion that the package *may* contain evidence of illegal activity. Atemkeng's package raised his suspicion because (1) the package did not feel like it contained "documents," which was the description provided on the waybill; (2) the value of the contents provided was $50, which given Koepke's experience was unusual for a package containing "documents;" and (3) the destination listed was Cameroon, and Customs had indicated that there had been an influx of counterfeit merchandise from that area, Africa, and suspected that the package may contain currency being sent to Africa in exchange for counterfeit goods. Based upon this subjective suspicion, Koepke opened and searched the package. In sum, application of the foregoing legal standards to the facts of this case, leads to the conclusion that Atemkeng's package was subjected to nothing more than a routine border search.

The defendant also argues that Officer Koepke's search did not occur at the "functional equivalent" of the border because his search "did not occur as soon as practicable before the border was to be crossed."[2] (Def.'s Br. at 9.) According to the defendant, the functional equivalent of the border in this case was the final destination of the package prior to its crossing the border, that is,

---

[2] The defendant does not dispute that, given her decision to drop off the package either in a FedEx drop box or at the Wauwatosa facility, it was a virtual certainty that a border crossing would take place and that nothing about the package would change in the course of crossing the border. *See United States v. Udofot*, 711 F.3d 831, 840 (8th Cir. 1983).

9

Memphis, Tennessee. I disagree. To reiterate, in order for the Wauwatosa FedEx facility to constitute the functional equivalent of the border there must be a reasonable certainty that the search was conducted as soon as *practicable* before the border crossing. *See Hill*, 939 F.2d at 936 (emphasis added). Neither the test established to determine whether a location constitutes the functional equivalent of the border nor the caselaw suggest that the search *must* occur at the final domestic destination prior to the border crossing. Rather, the test and caselaw simply establish that the search be conducted as soon as practicable before the border crossing. Here, Officer Koepke's testimony established that there was only a slim possibility that Atemkeng's package would have been searched at the Memphis, Tennessee airport because of time constraints and a lack of Customs and Border Patrol officers at that location. Such being the case, I am persuaded that Atemkeng's package was searched as soon as practicable before the package was to cross the international border.

To be sure, the defendant argues that it would be easier and more efficient for the government to have its Customs and Border Patrol officers search the international FedEx packages at the Memphis, Tennessee "hub" location, rather than at the FedEx locations in the Milwaukee metropolitan area. However, the fact remains that the government has allocated its resources such that its Customs and Border Patrol officers examine and search international FedEx packages for Customs violations at the local FedEx facilities and not at the Memphis, Tennessee "hub" location. And, in sum, the Fourth Amendment does not compel the government to have its Customs and Border Patrol agents examine and search the international packages for Customs violations at the final domestic destination prior to the border crossing. What it does compel is that the government examine and search the packages as soon as practicable prior to the crossing of the border.

10

Consequently, and for all of the foregoing reasons, it will be recommended that the defendant's motion to suppress be denied.

**NOW THEREFORE IT IS RECOMMENDED** that the defendant's motion to suppress be **DENIED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) - (C), Federal Rule of Criminal Procedure 59(b)(2), and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of the date of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to object in accordance with the rules cited herein waives your right to review.

**SO ORDERED** this 22nd day of November 2006, at Milwaukee, Wisconsin.

/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

11

Case 2:06-cr-00079-CNC   Filed 11/22/06   Page 11 of 11   Document 41